```
1  BENJAMIN TAYLOR (State Bar No. 240636)
   btaylor@taylorlawfirmpc.com
2  TANIA PRADO (State Bar No. 310168)
   tprado@taylorlawfirmpc.com
3  THE LAW OFFICES OF BENJAMIN TAYLOR
   A Professional Corporation
4  2121 Avenue of the Stars, Suite 2600
   Los Angeles, California 90067
5  Telephone: (310) 201-7600
   Facsimile: (310) 201-7601
6
   Attorneys for Plaintiff
7  ADAM KAPLAN
```

ELECTRONICALLY
FILED
Superior Court of California,
County of San Francisco
01/02/2026
Clerk of the Court
BY: MARIVIC VIRAY
Deputy Clerk

## SUPERIOR COURT OF CALIFORNIA

### FOR THE COUNTY OF SAN FRANCISCO – UNLIMITED CIVIL

| | |
|---|---|
| ADAM KAPLAN, an individual,<br><br>　　　　Plaintiff,<br><br>v.<br><br>BLACKSHARK.AI INC., a California corporation; and DOES 1 through 10, inclusive,<br><br>　　　　Defendants. | CASE NO:<br><br>**CGC-26-632603**<br><br>**COMPLAINT FOR BREACH OF CONTRACT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

-1-
COMPLAINT

Plaintiff ADAM KAPLAN ("Plaintiff"), by and through his undersigned counsel, hereby prays for relief and allege claims against Defendant BLACKSHARK.AI, INC. ("Defendant"), as follows:

## THE PARTIES

1. Plaintiff Adam Kaplan is an individual residing in the state of Rhode Island.

2. Defendant Blackshark.ai, Inc. is a California corporation with its principal place of business in the County of San Francisco.

3. Plaintiff is informed and believes, and based thereon alleges, that at all times relevant to this Complaint, the named Defendant and Does 1 through 10, inclusive, were acting in concert, and each defendant was the agent of each other defendant and was acting within the scope and purpose of such agency.

4. Venue is proper in this judicial district because Defendant is a business entity based in and doing business in the County of San Francisco, the actions and omissions that are the subject of this action occurred in the County of San Francisco, and the contract that is the subject of this action was entered into in the County of San Francisco.

## FIRST CAUSE OF ACTION

**(Breach of Contract)**

5. Plaintiff hereby restates and incorporates by reference each and every foregoing allegation contained above, as though set forth in full herein.

6. Plaintiff and Defendant entered into an agreement dated July 31, 2023. A true and correct copy of the agreement is attached hereto as Exhibit 1. Under the agreement, Plaintiff agreed to provide consulting services to Defendant, in exchange for payment as set forth therein.

7. The agreement provided for payment to Plaintiff of a monthly retainer in the amount of $5,000 USD, plus commissions of 5% on new business and 6% on recurring business, and a twelve-month tail period following termination for business closed during engagement.

8. In July 2024, Defendant confirmed via email that the retainer amount was being increased to $10,000 USD per month, effective August 24, 2024. Blackshark then consistently paid this retainer for nearly a year, from August 2024 through June 2025, reaffirming the agreement's

1  validity and its continued performance obligations.

2      9.    During his engagement, Plaintiff generated the only international sales (in Saudi Arabia, Israel, Singapore) closed by Blackshark between 2023 and 2025, including a €500,000 contract with the Israeli Ministry of Defense (July 2025), on which he is owed commission of €25,000, and a $100,000 contract in Singapore (August 2025), on which he is owed commission of $5,000.

    10.    Furthermore, under the agreement, there is a "tail period" of 12 months after his separation, during which Plaintiff is entitled to a commission on all income from accounts he originated. In December 2025, Blackshark closed a €250,000 deal, on which the Plaintiff is owed €12,500. That contract is set for a renewal in in June 2026 for a minimum €750,000, on which Plaintiff will be owed €37,500. Based on the September 23, 2025 termination date, Plaintiff will be entitled to commission on all income through September 23, 2026 on all accounts he originated for Defendant.

    11.    In August 2025, Blackshark abruptly asserted—contrary to all written evidence and payment history—that prior retainer payments were made "by mistake," and that no agreement existed. Despite this claim, Defendant had repeatedly confirmed the engagement in writing and had paid retainer invoices for ten consecutive months. After Plaintiff made demand for payment, Defendant changed its story, now characterizing the increased payments as not a "mistake" but as a gesture of "goodwill" only.

    12.    Further, in September 2025, Blackshark representatives conditioned payment of all past-due sums on Mr. Kaplan's closing of a new contract in India, an unlawful and coercive condition unrelated to existing contractual obligations. When Blackshark failed to cure its default, Plaintiff formally terminated the agreement on September 23, 2025 based upon non-payment. In addition to payment of all the commissions described above, Defendant also owes Plaintiff retainer payments of $10,000 for the months of June, July, August and September 2025, for a total of $40,000.

    13.    Plaintiff has performed his obligations under the agreement, except those if any which he was prevented or excused from performing.

14. Plaintiff made formal written demand upon Defendant for payment in November 2025, but Defendant has refused to make any payment.

15. As a result of Defendant's failures to make payment as alleged hereinabove, Plaintiff has been damaged in a total sum of not less than $130,000.00, exclusive of interest.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for relief against Defendant, as follows:

1. For compensatory damages in an amount according to proof;
2. For costs and expenses incurred, to the extent recoverable by law;
3. For the maximum interest permitted under the law; and
4. For such other and further relief as the Court may deem just and proper.

DATED: December 31, 2025

THE LAW OFFICES OF BENJAMIN TAYLOR
A Professional Corporation

By:_____
BENJAMIN TAYLOR
Attorneys for Plaintiff
ADAM KAPLAN

**DEMAND FOR JURY TRIAL**

Plaintiff ADAM KAPLAN hereby demands a jury trial on all claims so triable.

DATED: December 31, 2025

THE LAW OFFICES OF BENJAMIN TAYLOR
A Professional Corporation

By:_____
BENJAMIN TAYLOR
Attorneys for Plaintiff
ADAM KAPLAN

## Exhibit 1

## ADVISOR AGREEMENT

THIS ADVISOR AGREEMENT (this "Agreement") is made as of the date set forth on the signature page hereof by and between BLACKSHARK.AI INC, a California corporation (the "Company"), and the person or entity whose name is set forth as "Advisor" on the signature page of this Agreement ("Advisor").

1.  **Engagement of Independent Advisor.** The Company hereby engages Advisor to provide the services to the Company described herein, and Advisor hereby accepts such engagement, on the terms and conditions set forth below.

2.  **Description of Services.** Advisor shall provide to the Company the services described on Exhibit A (the "Services").

3.  **Compensation.** Advisor will be paid for the Services as described on Exhibit A and Exhibit B.

4.  **Expenses.** The Company agrees to reimburse Advisor for all reasonable business expenses incurred by Advisor while on the Company' business, in accordance with the Company' policies, provided Advisor obtains the Company's prior written approval for all such expenses. Advisor shall maintain such records as will be necessary to enable the Company to properly deduct such items as business expenses when computing the Company' federal income tax.

5.  **Term of Agreement.** The Company and Advisor agree that Advisor's engagement shall be "at will" and may be terminated by the Company or Advisor at any time for any reason, with or without cause upon written notice.

6.  **Independent Advisor Status.** Advisor represents and agrees that it is engaged under this Agreement as an independent Advisor and not an employee of the Company. Advisor has no authority to, and covenants and agrees that it will not, transact business, enter into agreements, or otherwise make commitments on behalf of the Company unless expressly authorized in writing. Advisor shall not be entitled to any rights or benefits under any bonus, pension, profit sharing, group insurance, death benefit, or any other benefit plan that the Company may provide for its employees. Advisor acknowledges and agrees that Advisor is obligated to report as income all compensation received by Advisor pursuant to this Agreement, and Advisor agrees to indemnify the Company and hold it harmless to the extent of any obligation imposed on the Company to pay any withholding taxes, social security, unemployment or disability insurance or similar items, including interest and penalties thereon, in connection with any payments made to Advisor by the Company pursuant to this Agreement.

7.  **Protection of Trade Secrets and Confidential Information.**

    7.1 Advisor recognizes that during the course of engagement with the Company, Advisor has had and will continue have access to certain trade secrets and Confidential Information (as defined below) relating to the business of the Company. Advisor agrees that all

1

Confidential Information shall remain the exclusive property of the Company. At all times during and following Advisor's engagement with the Company, Advisor agrees not to disclose to anyone outside the Company, nor to use for any purpose other than Advisor's work for the Company and for the Company's benefit, (i) any Confidential Information or (ii) any information the Company has received from others which the Company is obligated to treat as confidential or proprietary.

7.2    For purposes of this Agreement, "Confidential Information" includes all nonpublic information relating to the Company or its business that is disclosed to Advisor, that Advisor produces, or that Advisor otherwise obtains during the engagement. Examples of Confidential Information include, without limitation: any and all versions of the Company's proprietary software, design and development methodology, any Inventions or Works (as defined below), existing and to-be-developed or acquired product designs, systems and procedures, new product plans or ideas, market surveys, the identities of past, present or potential customers or suppliers, business and financial information, manufacturing information, pricing methods or data, contract information, marketing plans, personnel information, customer and supplier information, procedural and technical manuals and practices, servicing routines, and parts and supplier lists proprietary to the Company or its customers or suppliers, trade secrets as defined by Californian law, and any other sorts of items or information of the Company or its customers or suppliers which are not generally known to the public at large.

7.3    When Advisor's engagement ends and at any other time at the Company's request, Advisor shall promptly give the Company all materials containing Confidential Information that Advisor has or controls.

8.    **Inventions, Copyrights and Patents.**

8.1    For purposes of this Section 8, "Inventions" means discoveries, developments, concepts, ideas, improvements to existing technology, processes, procedures, machines, products, compositions of matter, formulae, algorithms, software, computer programs and techniques, and all other matters ordinarily intended by the word "invention," whether or not patentable or copyrightable, including all copyrights (including renewal rights), patent rights and trade secret rights, vested and contingent. "Inventions" also includes all records and expressions of those matters. "Works" means original works of authorship, including interim work product, modifications and derivative works, and all similar matter, whether or not copyrightable. Except as expressly provided herein, "Inventions" or "Works" shall only include inventions or works for which equipment, supplies, facilities or trade secret information of the Company was used and which were developed as a result of the Services Advisor is providing under this Agreement.

8.2    Advisor will promptly and fully disclose all Inventions to the Company. The Company shall be the sole owner of all rights and title including, without limitation, all Inventions and all rights in patents, patent applications, industrial designs, copyrights, trademarks, and trade secrets relating to the Inventions. Advisor agrees to and hereby does assign to the Company all rights in the Inventions and Works. Advisor shall further assist Company, at Company's expense, to further evidence, record and perfect such assignments, and to perfect, obtain, maintain, enforce, and defend any rights assigned.

2

8.3 Advisor warrants that all Inventions and Works shall constitute the original works of Advisor, and no such Inventions or Works (or portion thereof) shall be a derivative work based in whole or in part on any work copyrighted or subject to copyright by a third party or which incorporate the trade secrets of a third party. Furthermore, Advisor warrants that to the best of its knowledge that the Company's use of the Inventions or Works will not infringe upon the intellectual property rights of any third party.

9. **Non-solicitation.** So long as Advisor is engaged by the Company and for 12 months after Advisor's engagement ends, regardless of the reason it ends, Advisor shall not directly or indirectly solicit any employee or contractor to leave his or her employment or engagement with the Company. In addition, Advisor shall not (a) disclose to any third party the names, backgrounds, or qualifications of any Company employees or contractors or otherwise identify them as potential candidates for employment or engagement; (b) personally or through any other person approach, recruit, or otherwise solicit employees or contractors of the Company to work for any other entity or person; or (c) participate in any pre-employment or pre-engagement interviews with any person who was employed or contracted by the Company while Advisor was engaged by the Company.

10. **Warranties.** Advisor warrants that: (a) Advisor's performance of Services pursuant to this Agreement will not violate any agreement or obligation between Advisor and a third party; and (b) all Services provided by Advisor in connection with this Agreement shall be performed in a professional manner, shall be of high quality, and shall be in compliance with all applicable State of California laws and regulations.

11. **Indemnity.** Advisor shall indemnify, defend and hold the Company, its successors, officers, directors and employees harmless from any and all actions, causes of action, claims, demands, costs, liabilities, expenses, and damages (including attorneys' fees) arising out of, or in connection with (a) any claims that Advisor's work infringes any copyright, patent, trade secret, trademark, or other legal right of any third party, and (b) any other claim that, if true, would constitute a breach of Advisor's warranties set forth in Section 8 or Section 10 above.

12. **Return of Materials.** At the time of the expiration or termination of this Agreement, or sooner at the request of the Company, Advisor shall return all papers, drawings, notes, memoranda, manuals, specifications, designs, devices, documents, tapes, prototypes and products, and any other material on any media containing or disclosing any confidential or proprietary technical or business information.

13. **Notices.** All notices under this Agreement shall be in writing and shall be deemed given when personally delivered or three days after being sent by prepaid certified or registered mail, or any other electronic means that complies with applicable legislation regarding electronic transactions and signatures, to the address of the party to be notified as stated herein or to any other address as previously communicated by written notice from such party.

14. **Effect of Termination.** Upon termination of Advisor's engagement with the Company, the Company agrees to pay Advisor all compensation due and owing to Advisor as of

the date of termination, less legal deductions or offsets Advisor may owe to the Company. Upon termination of this Agreement, the terms and provisions of this Agreement shall also terminate, with the exception of the provisions contained in Sections 6 through 15 hereof. Those sections shall continue in full force and effect according to their terms.

15. **Miscellaneous.** If court proceedings are required to enforce any provision of this Agreement, the prevailing party shall be entitled to an award of reasonable costs and expenses of litigation and any appeal, including reasonable attorneys' fees. This Agreement shall be governed by the laws of the State of California. If any provision of this Agreement is held to be unenforceable as written, it shall be enforced to the maximum extent allowed by applicable law. This Agreement, together with Exhibit A and B hereto, is the final and complete expression of the parties' agreement on these subjects, and may be amended only in a writing signed by the Company and Advisor.

(*Signature Page Follows*)

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed by their duly authorized representatives as of the date set forth below.

**THE COMPANY:**

Blackshark.ai Inc.

By: *Michael Putz* (DocuSigned)
Name: Michael Putz
Title: CEO

Dated: 19.07.2023

**ADVISOR:**

_____
Name: Adam Kaplan

Dated:

# EXHIBIT A

**Services:**

Provide Strategic Advisor Go-to-Market Services to Company for the Non-US government sector.

Key initiatives:
1. Build the vision and plan define the strategy for the GTM in the Non-US government sector, dual usage technology, and funding.
2. Identify business and GTM partners:
3. Identify non-US end users and innovation partners: Focus initially on Ukraine, Saudi Arabia and UAE. Schedule in country visits to Saudi Arabia, UAE and Ukraine. Assist in monetizing Israel opportunity in-country and with NGA.
4. Define the GTM [Product and] Pricing strategy and model for the Region.

**Compensation:**

**Fees**
Advisor to be paid on a retained basis at a rate of 5.000 USD per month.

**Revenue share**
Consultant to be paid revenue commissions according to Exhibit B.

**Incentive compensation**
For the Services provided, the Company will grant Advisor Phantom Stocks, subject to approval of the Company's Board of Directors and in accordance with a Phantom Stock Agreement in a form customarily used by the Company. So long as Advisor remains in service to the Company, the foregoing grants shall vest as follows:
1. Initial 0.15% (2 years vesting, starting by signing and monthly pro-rata and single trigger)
2. Additional 0.15% (2 years vesting, starting with first deal and monthly pro-rata and single trigger)

**THE COMPANY:**                                              **ADVISOR:**

Blackshark.ai Inc.

By: *Michael Putz*
Name: Michael Putz
Title: CEO
Dated: 19.07.2023

Name: Adam Kaplan

Dated:

## Exhibit B

## ADVISOR SALES INCENTIVE COMPENSATION (July 2023 – July 2024)

### 1. Preamble

The purpose of this Consultant Sales Incentive Compensation Plan ("**Plan**") is to establish a sales incentive scheme that rewards the performance of eligible sales consultants or advisors. The Plan describes the terms and conditions under which they may earn bonus payments and commissions.

### 2. Definitions

Most relevant defined terms are set forth below. Other terms are defined in the Plan itself as noted.

**ACV:** an Agreement's Annual Contract Value. ACV is primarily determined by the agreed payment schedule provided in the Agreement (net invoice amount [excl VAT.]) In case a specific payment schedule has not been agreed, the ACV is calculated on the basis of an equal distribution of the net invoice total over the term of the Agreement. Early payments are attributed to the period in which they are made.

**Agreement**: a written contract approved by the Company's management for the access to and use of the Company's products and services including definitive pricing and/or joint go-to-market commitments that is signed by, and mutually binding on, Company and Customer or Partner. Long-form, not a term-sheet.

**Booking**: The execution of an Agreement for a sale of products or services with a Customer that meets the criteria for future revenue recognition and has undergone the required review by Company's management.

**Customer**: A customer who purchases products or services from the Company pursuant to the terms of an Agreement.

**Partner**: A third party company who enters into a Company authorized Agreement to act as a reseller, distributor, system integrator or co-marketing/co-selling agent of the Company.

**SQL or Sales Qualified Lead**: a prospective customer that has been vetted by sales and represented by an opportunity in Company CRM for which (i) the sales stage is "Develop" and (ii) the prospective customer's budget, decision making authority, needs and decision timelines have been identified ("BANT" – Budget, Authority, Need and Time).

**Participant** means the sales consultant or advisor of the Company.

### 3. General Provisions

3.1    Term

The Plan is effective as of **July 1, 2023** and will remain in effect through and including **June 30, 2024** replacing any previous agreements on incentive compensation. The Plan ends on June 30, 2024, unless amended or terminated by the Company.

3.2     Currency / Taxes / Social Security Contributions

Unless specified otherwise, all commission and bonus payments will be paid in USD. If a currency rate conversion is necessary to calculate commission payments in USD, the rate of exchange will be based on the applicable average exchange rate during the five business days prior to the Booking date.

4.     **Quantitative Targets**

4.1     Commission Rates

For all Agreements executed between July 1, 2023, until June 30, 2024, the following rates apply:

| Signed Revenues | Commission Rate | |
| --- | --- | --- |
|  | 1st year | Subsequent years |
| Recurring or Multiple-year Agreements[1] | 6% ACV | 4% ACV |
| One-off Agreements | 5% ACV | 4% ACV in case of extensions |

4.2     Split Commissions

In the event, that the revenue generated from an Agreement cannot be clearly allocated to one Participant, the above-mentioned commissions are divided as follows:

In case the revenue generated can be mainly allocated to one Participant, this Participant ("**Lead Contributor**") shall be entitled to 70% of the split commission. The remaining 30% of the commission is to be shared between others who substantially contributed to the revenue and participate in this Plan ("**Contributor(s)**"). In case a Lead Contributor cannot be identified, the total commission will be distributed evenly among Contributors.

The commission split shall be defined as soon as possible, ideally in "develop" sales stage in the Company CRM, which shall serve as "single source of truth" for commission allocation. The Company's sales leadership team retains the discretion to make final decisions on Split Commissions in case of disagreements.

4.3     Earning of Commissions

A Commission is deemed earned (an "Earned Commission") in case all of the following conditions are satisfied:
    (i)     written Agreement

(ii) the executed Agreement is accepted and approved by the Company,
(iii) the revenue was generated in compliance with all applicable legal and regulatory requirements as well as all Company's policies (including but not limited to pricing and discounting guidelines, Code of Conduct (as soon as adopted) as amended from time to time;
(iv) the Company has collected and retained payment in full and no Customer cancellations or refunds have occurred, and
(v) Participant diligently documents all opportunities in the provided CRM.

4.4   Commission Payment Timing

The Commission Payments shall be made as follows:

| Type of Agreement | Payment - Timing | |
| --- | --- | --- |
| | 1st year | Subsequent years |
| Recurring or Multiple-year Agreements | 45 days after initial payment | 45 days after applicable renewal date |
| One-off Agreements | 45 days after initial payment was completed | 45 days after collection payment |

4.5   Chargeback

The Company may at its sole discretion elect to advance the payment of commissions to a Participant before all conditions for an Earned Commission are met, as defined in Section 5.3.

The Company is entitled to recover any commission advance payments from Participant whenever it establishes that (i) it is no longer possible for the Earned Commission conditions to be fully met (e.g. due to a contract termination by the Customer) or (ii) the Participant of this Plan or employment contract.

4.6   Tail Period

Participant is eligible to earn commissions based on assigned accounts for a tail period of 12 months.

4.7   Responsibilities and Assignments

Participant agrees to perform diligently the duties and responsibilities assigned by the Company in compliance with all applicable legal and regulatory requirements, the Company's policies as amended from time to time, including but not limited to pricing and discounting guidelines, and the Code of Conduct (as soon as adopted).

It is in the Company's sole discretion to assign to Participant accounts, products and services Participant accounts, prices of products or services at any time.

All terms and conditions of the Company's relationship with the Customer shall be included in the Agreement. Participant may not enter into any side agreements or contracts, letters of intent, verbal agreements or other tacit understandings with a Customer that are not included in the final version of the Agreement executed by the Customer and approved by the Company.

## 5. Miscellaneous

As a condition of eligibility for any commission or bonus payments under this Plan, Participant must sign and return the Plan and Exhibit A to the Company no later than July 31, 2023.

In the event of disagreements or disputes arising from or related to the Plan and/or Term Sheet, sales leadership will attempt to resolve the disputed matter, upon review of the circumstances and of all the available documentation. In the event the dispute is not resolved to the Participant's satisfaction, the dispute shall be resolved by an arbitrator.

The Plan, its contents, existence, terms and conditions are Company confidential and proprietary information and subject to the confidentiality terms of the Participant's consultant or advisor agreement.

## 6. Integration

The terms in the Plan supersede any other agreements or promises made to Participant written or oral. The Plan is applicable to all Agreements concluded during the Term of this Plan.

### Acknowledgment

I acknowledge that I have read and understood the Plan and that I agree to the terms and conditions of the Plan.

_____
Place, Date


_____
Adam Kaplan